**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAVID A. LEDOUX, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Action No. RDB-24-2168 |
| SUBCOM, LLC, f/k/a TYCO | * | |
| ELECTRONICS SUBSEA | | |
| COMMUNICATIONS, LLC; | * | |
| TRANSOCEANIC CABLE SHIP | | |
| COMPANY, LLC; and | * | |
| T.E. CONNECTIVITY CORPORATION, | | |
| d/b/a C.S. TYCO RELIANCE, INC., | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This is a maritime action brought by Plaintiff David Ledoux, a captain of M/V RELIANCE, a cable-laying vessel allegedly owned by Defendants SubCom, LLC ("SubCom"), Transoceanic Cable Ship Company ("Transoceanic"), and T.E. Connectivity Corporation, doing business as C.S. Tyco Reliance, Incorporated. On September 30, 2021, Ledoux anchored M/V RELIANCE fifty-one nautical miles off the coast of Indonesia, allegedly at the direction of Defendants' agent, Ben Line Agencies—Singapore. On October 2, 2021, persons claiming to be members of the Indonesian Navy boarded the vessel and ordered Ledoux to move it to harbor in Batam, Indonesia. Once anchored there, the putative Indonesian Navy personnel ordered Ledoux to disembark for questioning, allegedly telling him that he had illegally anchored M/V RELIANCE in Indonesian waters, violating international law. After disembarking at Batam, Ledoux was arrested and jailed for twenty-one

days. He claims to have suffered serious injuries from his detention, including physical injury, extreme weight loss, mental anguish, and post-traumatic stress.

On July 26, 2024, Ledoux filed this lawsuit. (ECF No. 1.) After Defendants moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* (ECF No. 10), this Court granted Ledoux's Motion for Leave to File First Amended Complaint on July 9, 2025. (ECF No. 17.) Ledoux then filed the operative, six-count Amended Complaint. (ECF No. 18.) The Amended Complaint alleges Jones Act[1] negligence (Count I), unseaworthiness (Counts III and IV), and general maritime negligence (Count VI) against Defendants SubCom and Transoceanic. (*Id.*) It also alleges unseaworthiness (Count II) and general maritime negligence (Count V) against Defendant T.E. Connectivity Corporation. (*Id.*) This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1333. The core allegations of the Amended Complaint are that: (1) Defendants, through their agent, directed Ledoux to anchor in the location that he anchored; (2) Defendants were or should have been aware of warnings that similar vessels anchoring in similar locations had been detained, and their captains arrested, by persons claiming to be part of the Indonesian Navy; and (3) but for Defendants' failure to alert Ledoux to the existence of such warnings, he would not have anchored M/V RELIANCE in the location which he did. (*Id.*)

---

[1] The Jones Act, part of the Merchant Marine Act of 1920, 46 U.S.C. §§ 30104 *et seq.*, provides seamen injured in the course of employment with a negligence cause of action against their employer. *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009). Traditionally, maritime law provided no such cause of action, and Congress enacted the Jones Act specifically to overturn the Supreme Court's decision in *The Osceola*, 189 U.S. 158 (1903). *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 40 (1943) (collecting cases).

Now pending is Defendants SubCom and Transoceanic Cable's Motion to Dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).[2] (ECF No. 19.) The Court has reviewed the parties' submissions; no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Defendants assert that the act of state doctrine and the political question doctrine bar Ledoux's claims in this case. As this Court has previously noted, the validity or lack thereof of the actions of the Indonesian government is not the basis of this lawsuit. Ledoux's claims are based on the alleged failure of Defendants to notify him of dangers inherent in approaching the coast of Indonesia. Accordingly, and for the following reasons, the Motion to Dismiss (ECF No. 19) is DENIED.

## BACKGROUND

At the motion-to-dismiss stage, the Court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). Unless otherwise noted, all facts herein come from the Amended Complaint (ECF No. 18).

### I.    Factual History

Ledoux was employed by Defendants as a seaman—and specifically as captain—aboard the cable-laying vessel M/V RELIANCE at all times relevant to this case. (ECF No. 18 ¶¶ 4, 8, 10.) M/V RELIANCE is registered with the United States Coast Guard, and bears Coast Guard number 9236494. (*Id.* ¶ 5.) Defendants SubCom and Transoceanic Cable are

---

[2] As of January 14, 2026, Defendant T.E. Connectivity has not filed any response in this case, nor has any attorney entered an appearance on its behalf.

Delaware limited liability companies with their principal places of business in New Jersey. (*Id.* ¶¶ 5–6.) Defendant T.E. Connectivity Corporation, doing business as C.S. Tyco Reliance, is a Pennsylvania corporation with its principal place of business in New Jersey. (*Id.* ¶ 7.) Ledoux alleges that each Defendant owns or operates M/V RELIANCE and that all Defendants do business at 1011 East McComas Street in Baltimore, Maryland. (*Id.* ¶¶ 5–7.)

On September 30, 2021, while Ledoux was employed as captain of and seaman on M/V RELIANCE, Defendants' agent, Ben Line Agencies—Singapore, instructed Plaintiff to anchor the vessel fifty-one nautical miles off the coast of Indonesia. (*Id.* ¶¶ 13–14.) Ledoux alleges that Defendants did not inform him that Protection and Indemnity Clubs[3] ("P&I Clubs") had warned Defendants "about the Indonesian Navy detaining vessels and seaman [*sic*] which the Indonesian Navy claimed were anchored illegally." (*Id.* ¶ 15.) Ledoux alleges that many of those detentions occurred in the same area in which Defendants and their agent directed him to anchor M/V RELIANCE. (*Id.* ¶ 16.) Defendants failed to provide Ledoux with notice of the P&I Clubs' warnings or copies of the warnings themselves. (*Id.* ¶ 17.) He claims that but for the failure to provide these warnings, he would not have anchored M/V RELIANCE in the instructed location. (*Id.* ¶ 18.)

On October 2, 2021, while still anchored fifty-one miles off the Indonesian coast, armed Indonesian Navy personnel boarded M/V RELIANCE and told Ledoux that the vessel was illegally anchored in Indonesian waters. (*Id.* ¶ 19.) They ordered Ledoux to move the vessel and anchor it in the harbor of Batam, Indonesia. (*Id.* ¶ 20.) The naval personnel claimed that

---

[3] "Protection and Indemnity Clubs are associations of ship owners who band together to provide insurance." *Liberty Woods Int'l, Inc. v. Motor Vessel Ocean Quartz*, 219 F. Supp. 3d 494, 495 n.1 (D.N.J. 2016).

M/V RELIANCE would be inspected at Batam for its seaworthiness. (*Id.*) Once M/V RELIANCE was anchored at Batam, the Indonesian Navy personnel ordered Ledoux to disembark and go ashore for questioning. (*Id.* ¶ 21.) In Batam, the Indonesian Navy arrested Ledoux and placed him in a jail, alleging that he had illegally anchored in Indonesian waters and violated the United Nations Convention on the Law of the Sea.[4] (*Id.* ¶ 22.)

Ledoux spent twenty-one days in an Indonesian jail. (*Id.* ¶ 23.) The Amended Complaint alleges that the jail's conditions were "horrible": Ledoux claims he was assaulted, suffered physical injuries from the assault, and also faced "extreme weight loss"; burns; diarrhea from unclean food and water and stress; "major stomach and body cramps"; "constant insect bites"; "back, arm, and leg pain"; "exposure to mosquitoes, roaches[,] and other insects"; lack of sleep, mental anguish, and subsequent post-traumatic stress. (*Id.* ¶¶ 23–26.) He alleges that he is expected to experience "permanent physical limitations, pain and suffering, sleep issues[,] emotional distress[,] and loss of enjoyment of life." (*Id.* ¶ 27.)

## II.    Procedural History

On July 26, 2024, Ledoux filed a three-count complaint against SubCom, LLC, Transoceanic Cable Ship Company, LLC, and T.E. Connectivity Corporation, doing business as C.S. Tyco Reliance, Incorporated. (ECF No. 1.) He alleged Jones Act negligence (Count I), unseaworthiness (Count II), and general maritime negligence (Count III). (*Id.*) The crux of his

---

[4] The United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397, is an international treaty ratified by 171 parties as of September 22, 2025. *See* United Nations – Oceans & Law of the Sea, *Chronological List of Ratifications, Accessions, and Successions*, https://www.un.org/depts/los/reference_files/chronological_lists_of_ratifications.htm (Sep. 22, 2025). The United States is not party to the Convention but has recognized that its "'baseline provisions reflect customary international law.'" *United States v. Beyle*, 782 F.3d 159, 166 (4th Cir. 2015) (quoting *United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992)).

allegation against Defendants is that they failed to warn him of the P&I Clubs' warnings that other vessels had been detained by personnel claiming to represent the Indonesian Navy and that but for Defendants' failure to provide such warning, Ledoux would not have anchored M/V RELIANCE in the instructed location. *See generally* (*id.*).

On September 27, 2024, Defendants SubCom and Transoceanic filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 10.) After the parties had fully briefed the Motion to Dismiss, *see* (ECF Nos. 13, 14), Ledoux filed on December 23, 2024, a Motion for Leave to File Amended Complaint. (ECF No. 15.)

On July 9, 2025, this Court entered a Memorandum Order granting Ledoux's Motion to Amend (ECF No. 15) and denying as moot the Motion to Dismiss (ECF No. 10). (ECF No. 17.) On the same day, Ledoux filed the operative, six-count Amended Complaint. (ECF No. 18.) The Amended Complaint alleges Jones Act negligence (Count I), unseaworthiness (Counts III and IV), and general maritime negligence (Count VI) against SubCom and Transoceanic; as well as unseaworthiness (Count II) and general maritime negligence (Count V) against T.E. Connectivity. *See generally* (*id.*).

On July 23, 2025, Defendants SubCom and Transoceanic Cable (hereinafter, "Defendants") filed the pending Motion to Dismiss. (ECF No. 19.) They raise four arguments for dismissal. First, Defendants assert that the act-of-state doctrine bars Ledoux's claims. (*Id.* at 11–16.) Second, they argue that this case is not justiciable under the political question doctrine. (*Id.* at 16–19.) Third, they argue that Ledoux breached his duty to anchor M/V RELIANCE in a safe and lawful location, making recovery barred under the primary duty

rule. (*Id.* at 19–24.) Fourth, and finally, Defendants argue that they had no duty to warn or prevent lawful government activity. (*Id.* at 24–26.)

## STANDARD OF REVIEW

### I.     Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. Under Rule 12(b)(1), the plaintiff bears the burden of proving, by preponderance of the evidence, the existence of subject matter jurisdiction. *Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). As relevant here, the United States Court of Appeals for the Fourth Circuit has stated that "the political question doctrine [is] an issue of subject matter jurisdiction." *Hencley v. Fluor Corp.*, 120 F.4th 412, 422 n.3 (4th Cir. 2024) (citing *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 154–55 (4th Cir. 2016); *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 407 n.9 (4th Cir. 2011)). Accordingly, political-question-doctrine challenges are best construed as invoking Rule 12(b)(1). Under Rule 12(b)(1), a court may "may consider evidence outside the pleadings without converting the motion to dismiss into a motion for summary judgment." *Al Shimari*, 840 F.3d at 154 (citing *In re KBR, Inc., Burn Pit. Litig.*, 744 F.3d 326, 333 (4th Cir. 2014)).

### II.     Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the "sufficiency of a complaint," but does not "resolve

contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth "'a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570). A complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. A complaint need not include "detailed factual allegations," *Iqbal*, 556 U.S. at 678, but it must contain "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. When considering a motion to dismiss under Rule 12(b)(6), a district court may not ordinarily consider evidence outside of the pleadings. *Doriety ex rel. Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (citing Fed. R. Civ. P. 12(d)).

## ANALYSIS

SubCom and Transoceanic's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) raises four arguments. (ECF No. 19-1.) First, they assert that the act-of-state doctrine bars Ledoux's claims. (*Id.* at 11–16.) Second, they argue that this case is not justiciable under the political question doctrine. (*Id.* at 16–19.) Third, they argue that Ledoux breached his duty to anchor M/V RELIANCE in a safe and lawful location and recovery is barred under the primary duty rule. (*Id.* at 19–24.) Fourth, and finally, they argue that they had no duty to warn or prevent lawful government activity. (*Id.* at 24–26.) Defendants assert these

arguments as to Counts I, III, IV, and VI. *See generally* (*id.*). They make no arguments as to Counts II and V, which are lodged at T.E. Connectivity Corp. (ECF No. 18.) As such, this decision does not discuss Counts II and V.

## I.    Act of State Doctrine

Defendants first assert that the Amended Complaint is barred by the act of state doctrine. (ECF No. 19-1 at 11–15.) Defendants argue that Ledoux's twenty-one-day detention was an official act of Indonesia. (*Id.* at 15.) They also argue that resolving Ledoux's claims would require this Court to determine the legality of the detention. (*Id.*) The act of state doctrine does not allow such determinations by federal courts, but it is inapplicable here because resolving Ledoux's claims would not require this Court to rule on the validity of his detention. Therefore, the act of state doctrine is not cause for dismissal. Quite simply, this case is based on Ledoux's claim that Defendants failed to notify him of dangers in approaching the Indonesian coast. The legality or illegality of actions by the Indonesian government is not the basis of this lawsuit.

The act of state doctrine prevents federal courts from "declaring invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *accord Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964); *Hourani v. Mirtchev*, 796 F.3d 1, 11–12 (D.C. Cir. 2015). The doctrine is a function of the separation of powers, *Kirkpatrick*, 493 U.S. at 404, reflecting the notion that the Executive Branch's ability to achieve its goals in foreign affairs may be impeded by the Judiciary adjudicating the "validity of foreign acts of state." *Sabbatino*, 376 U.S. at 423. As the Supreme Court held in *Kirkpatrick*, however, a federal court only applies the doctrine when it

"*must decide*—that is, when the outcome of the case turns upon—the [legal] effect of official action by a foreign sovereign." *Id.* at 406. When a federal court does not need to determine the validity of a foreign sovereign's conduct, the act of state doctrine does not apply. *Id.*

*Kirkpatrick* originated as a civil suit between two bidders for a contract with the Nigerian Air Force for construction and equipment of an aeromedical center at a Nigerian Air Force base. *Id.* at 401–02. The defendants had bribed Nigerian government officials to win the contract, a fact they admitted when they pleaded guilty to federal criminal charges. *Id.* at 402. Nigerian law prohibits bribery in connection with government contracts. *Id.* Plaintiff, another company that had bid for the contract, brought a civil suit for damages related to not winning the contract. *Id.* The defendants moved to dismiss, invoking the act of state doctrine. *Id.* After the United States Court of Appeals for the Third Circuit held that the act of state doctrine did not apply, the defendants appealed to the Supreme Court. *Id.* at 403–04. There, they argued that "the facts necessary to establish [the plaintiff's] claim would also establish that the contract was unlawful." *Id.* at 406. A unanimous Supreme Court disagreed, ruling that the legality of the Nigerian contract "is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires." *Id.* The Court made clear that the "doctrine has no application to the present case because the validity of no foreign sovereign act is at issue." *Id.* at 409–10.

Similarly, consistent with the Supreme Court's opinion in *Kirkpatrick*, the act of state doctrine has no application to this case. Ledoux alleges that personnel of the Indonesian Navy arrested and jailed him for twenty-one days in poor conditions causing severe personal injury. (ECF No. 18 ¶¶ 22–23.) He asserts that his detention was caused both by (1) Defendants'

agent, Ben Line Agencies—Singapore, instructing him to anchor M/V RELIANCE fifty-one nautical miles off the Indonesian coast and (2) Defendants' failure to warn Ledoux of the foreseeable danger of arrest and incarceration created by anchoring the vessel there. *See* (*id.* ¶¶ 13–18, 30, 52, 63, 85). Even assuming without deciding that Ledoux's detention was an official act of Indonesia, that act does not trigger the doctrine because this Court would not need to determine the act's validity to resolve Ledoux's claims. To succeed on his claims against Transoceanic and SubCom, Ledoux would be required to prove, at the very least, two facts. First, he would need to show that he was detained and jailed by persons who claimed to be part of the Indonesian Navy. Second, he would be required to prove that Defendants or their agents, Ben Line Agencies—Singapore, failed to warn him that anchoring M/V RELIANCE fifty-one nautical miles off the Indonesian coast would create a danger of detention.[5] In turn, to prove a failure to warn, Ledoux would need to show that his detention was foreseeable to Defendants given the location at which Ben Line Agencies—Singapore directed Ledoux to anchor the vessel on September 30, 2021, and the P&I Clubs' warnings about other similar detentions. *See Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980) ("Liability for failure to warn thus arises from foreseeability, or the knowledge that particular conduct will create danger."). At no point, however, would Ledoux need to prove, nor this

---

[5] The Court notes that Ledoux would likely have to style and prove this fact differently for his unseaworthiness claim, as proving unseaworthiness would require him to show that Defendants did not keep M/V RELIANCE in "a seaworthy condition." *Mitola v. Johns Hopkins Univ. Applied Physics Lab'y*, 839 F. Supp. 351, 357 (D. Md. 1993). Counts III and IV of the Amended Complaint allege that M/V RELIANCE was not seaworthy because the vessel lacked "proper procedures for being informed about P&I Club warnings and warnings issued by other entities concerning anchoring off the coast of Indonesia." (ECF No. 18 ¶¶ 51, 63.)

Court decide, that any official Indonesian act was valid or invalid. Accordingly, just as in *Kirkpatrick*, the act of state doctrine does not apply to this case.

Defendants contend that, if the Amended Complaint survives the Motion to Dismiss, they will implead Indonesia pursuant to Federal Rule of Civil Procedure 14(c).[6] (ECF No. 19-1 at 6–7, 11–12.) With Indonesia having been impleaded, they argue, this Court would "unquestionably" be required to rule on the validity of an official act of a foreign sovereign— the detention and arrest of Ledoux—thereby triggering the act of state doctrine. (*Id.* at 7.) This argument is simply without merit. Without ruling in advance on the question of impleader in this case, the Court would note that Defendants cannot create a foreign sovereignty issue based upon Ledoux's clear claims of failure to be notified. The ability of Defendants to seek to implead the Indonesian government may await further rulings of this Court. Rule 14(c) does not affect the Court's conclusion that the act of state doctrine does not apply.

## II.   Political Question Doctrine

Defendants' second argument for dismissal is that this case is not justiciable because it presents a political question. (ECF No. 19-1 at 16.) As noted above, the Fourth Circuit considers "the political question doctrine as an issue of subject matter jurisdiction." *Hencley*, 120 F.4th at 422 n.3 (citing *Al Shimari*, 840 F.3d at 154–55; *Taylor*, 658 F.3d at 407 n.9). Therefore, Defendants' political-question-doctrine argument is better understood as seeking

---

[6] Rule 14(c) governs third-party practice in admiralty and maritime cases. It provides, in relevant part, that when "a plaintiff asserts an admiralty or maritime claim under Rule 9(h), the defendant . . . may, as a third party plaintiff, bring in a third-party defendant who may be wholly or partly liable—either to the plaintiff or the third-party plaintiff—for remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 14(c). Ledoux has filed this case under Rule 9(h). (ECF No. 18 ¶ 1.)

dismissal under Rule 12(b)(1), not Rule 12(b)(6) because, under Rule 12(b)(1), a party seeks dismissal for lack of subject matter jurisdiction. When ruling on a 12(b)(1) motion, a district court "may consider evidence outside the pleadings without converting the motion to dismiss into a motion for summary judgment." *Al Shimari*, 840 F.3d at 154 (citing *In re KBR, Inc., Burn Pit. Litig.*, 744 F.3d at 333).

In support of their political-question-doctrine argument, Defendants include in their Motion to Dismiss excerpts of a June 10, 2022, article about Ledoux's detention from *gCaptain*, a maritime news website. (ECF No. 19-1 at 17–18 (quoting ECF No. 10 Ex. 2 (gCaptain Article)). The article states that Ledoux had "extensive contact with the [United States Department of State] attaché in Jakarta" while jailed by the Indonesian Navy (*Id.*) Relying on that article, Defendants contend that the State Department was "actively involved in monitoring [Ledoux's] detention conditions" while "considering and protecting" the United States' foreign policy goals for Indonesia. (*Id.* at 8.) Defendants argue that, if this case survives the motion-to-dismiss stage, the Court will be "require[d]" to "express negative opinions" of "the actions taken by Indonesia" and its Navy. (*Id.* at 18.) They argue that such adjudication "risks impeding or upsetting the sensitive and critical relationship . . . between the United States and Indonesia." (*Id.*) Thus, they assert that this case presents a political question depriving the Court of jurisdiction. (*Id.* at 16.) Although certain facts underlying this case may contain political implications, the case is very simply not a political question. Accordingly, this Court has jurisdiction over Ledoux's claims.

"In general, the Judiciary has a responsibility to decide the cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). The political question doctrine

is a "narrow exception" to that rule reflecting the separation of powers. *Id.* at 195. It "deprives courts of jurisdiction over 'controversies which revolve around policy choices and value determinations constitutionally committed' to Congress [or the Executive.]" *Al Shimari*, 840 F.3d at 154 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

In *Baker v. Carr*, 369 U.S. 186, 217 (1962), the Supreme Court laid out six factors to determine whether a case presents a nonjusticiable political question. The factors address whether there is: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving the issue"; (3) "the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution of the issue without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* In addition to these six factors, *Baker* made clear that politically-charged cases are not always political questions. *Id.* at 217 ("The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'"). More recently, in *Zivitofsky*, the Court reaffirmed that principle, stating that courts are not excused from doing their usual work "merely because the issues have political implications." 566 U.S. at 196. Further, and as relevant here, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 396 U.S. at 211.

The parties' briefing of this issue fails to analyze the *Baker* factors and instead centers on the present applicability of a 2014 decision of this Court, *Du Daobin v. Cisco Systems, Inc.*, 2 F. Supp. 3d 717 (D. Md. 2014). *See* (ECF No. 19-1 at 18–19; ECF No. 22-1 at 6–7; ECF No. 23 at 6–8). The Court first explains why *Du Daobin* is inapposite here and then turns to an analysis of the relevant *Baker* factors.

### a. *Du Daobin*

*Du Daobin* concerned China's Golden Shield, an Internet-surveillance system used by the Chinese government. *Id.* at 720. Plaintiffs in that case were Chinese nationals and self-proclaimed dissidents who claimed to have been detained, subjected to forced labor, and tortured because of their dissident views as a result of the Golden Shield program. *Id.* The defendants, Cisco, an American technology company, and its chief executive officer, were alleged to have made the Golden Shield for China "specifically for the purpose of facilitating [the Chinese government]" in torturing dissidents. *Id.* The plaintiffs filed an eleven-count lawsuit, alleging violations under the Alien Tort Statute, 28 U.S.C. § 1350. *Du Daobin*, 2 F. Supp. 3d at 721. The defendants filed a motion to dismiss the complaint based on the act of state doctrine and political question doctrine, among other proffered theories of relief. *Id.* at 722. This Court held in *Du Daobin* that the political question doctrine applied and rendered the case nonjusticiable, pointing specifically to the fourth, fifth, and sixth *Baker* factors. *Id.* at 724–25. The Court explained that "[t]o adjudicate this question would require the Judiciary to determine whether the U.S. rules and regulations surrounding the export of products to China are sound," which would in turn "demonstrate a lack of respect for both the Executive and

Legislative branches," "question a political decision already clearly made," and "introduce the possibility of additional voices where only a single voice should be heard." *Id.* at 725.

*Du Daobin* is inapposite for at least two reasons. First, the plaintiffs in that case brought their claims under the Alien Tort Statute, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Alien Tort Statute often implicates the political question and act of state doctrines because of its orientation towards non-citizens and concomitant foreign policy implications. *See Kiobel v. Royal Dutch Petrol., Inc.,* 569 U.S. 108, 116 (2013); *Sosa v. Alvarez-Machain,* 542 U.S. 692, 727 (2004). Therefore, in *Kiobel,* the Supreme Court instructed district courts to exercise special caution towards Alien Tort Statute claims because they present "'the danger of unwarranted judicial interference in the conduct of foreign policy.'"[7] *Id.* at 726 (quoting *Kiobel v. Royal Dutch Petrol. Co.,* 569 U.S. 108, 116 (2013)). Here, Ledoux's Jones Act negligence, unseaworthiness, and general maritime negligence claims raise none of the same foreign policy or separation of powers concerns inherent to Alien Tort Statute lawsuits. This fact alone makes *Du Daobin* inapplicable here.

Second, and perhaps even more importantly, in order for the plaintiffs in *Du Daobin* to have been successful in their claims against Cisco, they would have needed to show that Cisco had knowledge that the Golden Shield would be used by the Chinese government to monitor and torture dissidents. That is, they would have needed to prove that Cisco was entwined in

---

[7] As *Du Daobin* explained, "even before [the Supreme Court decided] *Kiobel* [in 2013], a number of courts considering [Alien Tort Statute] claims had dismissed [them] on political question grounds." 2 F. Supp. 3d at 724 (citing *Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 984 (9th Cir. 2007); *Joo v. Japan,* 413 F.3d 45, 46 (D.C. Cir. 2005)).

alleged international law violations by a foreign government. As this Court has already explained, Ledoux does not need to make any similar showing. He needs only show the fact of his detention, without any question of its propriety. As such *Du Daobin* is inapposite here.

### b. *Relevant* Baker *Factors*

As noted above, the Supreme Court in *Baker* explained that nonjusticiable political questions often evince one or more of its six independent factors. *Baker*, 369 U.S. at 217; *accord In re KBR, Inc., Burn Pit Litig.*, 744 F.3d at 217. None of the factors is met in this case. First, there is no "textually demonstrable constitutional commitment" of any issue "to a coordinate political branch." *Baker*, 396 U.S. at 217. Ledoux's case alleges Jones Act negligence, unseaworthiness, and general maritime negligence—private law issues or tort squarely entrusted to the federal courts in the Constitution.

Second, there is no "lack of judicially discoverable and manageable standards for resolving" this case. *Id.* As explained above, federal courts have "a superabundance of tools" to resolve tort actions. *Cawthorn v. Amalfi*, 35 F.4th 245, 256 (4th Cir. 2022). Additionally, there is no shortage of cases from explaining and drawing the contours of the legal standards for each of Ledoux's claims. As regards Jones Act negligence, see, for example, *Martin v. Harris*, 560 F.3d 210, 216 (4th Cir. 2009) (internal citation omitted); *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 436 (4th Cir. 1999) (internal citation omitted). For unseaworthiness, see, for example, *Dise v. Express Marine, Inc.*, 476 F. App'x 514, 519–20 (4th Cir. 2011); *Hernandez*, 187 F.3d at 439 (citing *Gosnell v. Sea-Land Serv., Inc.*, 782 F.2d 464, 467 (4th Cir. 1986)); *Mitola*, 839 F. Supp. at 357; *Carney v. United States*, 598 F. Supp. 2d 715, 717 (D. Md. 2009). Finally, for general maritime negligence, see, for example, *Mullinex v. John Crane Inc.*, No.

18-cv-00033, 2021 WL 8129699, at *1–2 (E.D. Va. Oct. 25, 2021) (collecting cases). The second *Baker* factor is simply not met here.

The third through sixth *Baker* factors follow the first and second. *Cawthorn*, 35 F.4th at 268 n.2 (Richardson, J., concurring) (explaining that the first two *Baker* factors are most important as they form the "Article-III heart of that doctrine that deals with core questions of justiciability); *Kravitz v. U.S. Dep't of Com.*, 336 F. Supp. 3d 545, 561 (D. Md. 2018) (stating that the first two factors are "the most important" of the six); *Nat'l Ass'n for Advancement of Colored People v. Bureau of Census*, 382 F. Supp. 3d 349, 384 (D. Md. 2019) (the same). Those factors— which concern courts making initial policy determinations, courts not giving due respect to the political branches, a need for a court to adhere to a prior political decision, and the potential of courts creating embarrassment from too many pronouncements on one question—are not present here for the same reasons that the first two are not present. Deciding Ledoux's claims requires would not require this Court to make any policy determination nor eschew respect for the political branches. Similarly, there is no need for any adherence to a political decision already made as no political decision is relevant to this case. Finally, given that the political departments of the Government have not spoken on Ledoux's lawsuit against Defendants, a decision from this Court would not cause embarrassment. Put plainly, the political question doctrine has no bearing on this case. Ledoux's claims are justiciable.

## III.    Primary Duty Rule

Defendants' third argument for dismissal is that, as captain of M/V RELIANCE, Ledoux had a primary duty to anchor the vessel in a safe and lawful location. (ECF No. 19-1 at 19.) They contend that "[p]rudent seamanship required [him] to know whether or not he

was inside" Indonesia's territorial waters when he anchored the vessel. (*Id.* at 19–20.) Invoking the little-used and roundly-critiqued primary duty rule of maritime law, Defendants ask the Court to find that Ledoux is barred from recovery here.

The primary duty rule states that "a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel." Robert Force & Martin J. Norris, *The Law of Seamen* § 30:44 (5th ed. 2025); *accord* 1 *Schoenbaum's Admiralty & Mar. Law* § 6:24 (7th ed. 2026). The rule is obscure, invoked with exceeding scarcity by the federal courts, and, when invoked, often criticized.[8] It originates from Judge Learned Hand's opinion for the United States Court of Appeals for the Second Circuit in *Walker v. Lykes Brothers S.S. Co.*, 193 F.2d 772, 774 (2d Cir. 1952). Since then, the First, Second, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits have challenged the doctrine as inconsistent with the concept of comparative negligence and Supreme Court precedent; have rejected it outright; or have declined to apply it given its shaky standing.[9]

---

[8] "The primary duty rule is an anomalous concept within maritime tort law," because comparative negligence is the standard and has been so since the mid-nineteenth century. David Gray Carlson, *The Primary Duty Rule in Admiralty*, 27 Hastings L.J. 835, 835, 838 (1976). The rule originated in cases brought by railroad employees, working in tandem with the concept of assumption of risk as a bar to recovery for railroad employees. *See Tiller v. Atl. Coast R.R.*, 318 U.S. 54, 58–66 (1943) (explaining this history). Congress abolished the primary duty rule and assumption of the risk for railroad employees through its 1939 amendments to the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (amended 1939). *Tiller*, 318 U.S. at 64–67. Its application to maritime law came thirteen years later in *Walker. Lykes Brothers S.S. Co.*, 193 F.3d 772, 774 (2d Cir. 1952), apparently despite Congress's abolition of the rule for railroad employees. *See Boat Dagny v. Todd*, 224 F.2d 208, 211 (1st Cir. 1955) (complaining that *Walker* was inconsistent with the 1939 FELA amendments and *Tiller*).

[9] *See Boat Dagny*, 224 F.2d at 211 (squarely criticizing *Walker*, just three years later, as inconsistent with federal law and the Supreme Court's holding in *Tiller v. Atl. Coast R.R.*, 318 U.S. 54, 66–67 (1943)); *Dunbar v. Henry Du Bois's Sons Co.*, 275 F.2d 304, 306 (2d Cir. 1960)

Furthermore, despite Defendants' assertions to the contrary, the Fourth Circuit has never squarely addressed the primary duty rule. Only one Fourth Circuit case discusses *Walker*, and only briefly. In *Mason v. Lynch Brothers Co.*, 228 F.2d 709, 711 (4th Cir. 1956), the Fourth Circuit considered a primary duty rule challenge to a maritime negligence suit. The defendants invoked *Walker* as authority for the court to dismiss the lawsuit. The court first recognized the conflict between *Walker* and the First Circuit's 1955 decision in *Boat Dagny v. Todd*, 244 F.2d 208, 211 (1st Cir. 1955), which criticized *Walker* as being inconsistent with federal law and Supreme Court precedent. Rather than weigh in on the circuit split, however, the *Mason* court explicitly avoided the question of the primary duty rule. 228 F.2d at 711. *Mason* explained that the primary duty rule was inapplicable regardless of its legal validity because the rule applies to "captains" of "ocean going vessel[s]" and the plaintiff there was merely a seaman operating as a captain of a tugboat in "very limited operations of short duration." *Id.* at 712.

Even if the Court were to apply the primary duty rule to this case, however, Ledoux's claims would survive the motion to dismiss. As the Seventh Circuit explained in *Kelley v. Sun Transportation Co.*, 900 F.2d 1027, 1031 (7th Cir. 1990), the primary duty rule *only* applies if there is a finding of no negligence or unseaworthiness attributable to the defendant. Additionally, the Ninth Circuit has clarified that the rule does not apply where the plaintiff is

---

(two of three judges expressly rejecting *Walker* as "incompatible with the congressional mandate that contributory negligence and assumption of risk shall not bar recovery in a Jones Act case"); *Kendrick v. Ill. Cent. Gulf R.R. Co.*, 669 F.2d 341, 343–44 (5th Cir. 1982) (denouncing *Walker* in favor of proportionate fault reduction); *Chesapeake & Ohio Ry. v. Newman*, 243 F.2d 804, 808 (6th Cir. 1957); *Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031 (7th Cir. 1990) (denouncing *Walker*'s complete-bar rule); *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 907 (9th Cir. 1994) (same); *Villers Seafood Co. v. Vest*, 813 F.2d 339, 342–43 (11th Cir. 1987) (specifically declining to follow *Walker*'s progeny and limiting the primary duty rule).

injured by a "dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated." *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 907 (9th Cir. 1994). Ledoux adequately pleads that Defendants failed to warn him of the risks of anchoring M/V RELIANCE fifty-one nautical miles off the Indonesian coast given the P&I Club warnings of Indonesian Navy personnel detaining other ships and captains. (ECF No. 18 ¶¶ 30, 51, 63, 85.) Further, his Amended Complaint alleges that he did not create the dangerous condition of the location at which he anchored M/V RELIANCE, as it was Defendants' agent, Ben Line Agencies—Singapore, which directed him to anchor in that spot. (*Id.* ¶¶ 13–14.)

### IV.    Duty to Warn or Prevent Lawful Government Activity

Defendants SubCom and Transoceanic's final argument for dismissal is that they had no duty to warn Ledoux of the risk of detention by persons claiming to be part of the Indonesian Navy. (ECF No. 19-1 at 24.) They argue that "[c]aptains are responsible for the lawful operation of their vessel," "have a duty to know and 'conform [their] conduct' to that law of those seas in which [they] sail[]," and that, accordingly, Defendants had no duty to warn of lawful governmental activity. (*Id.* (quoting *The Griffin*, 63 U.S. 491, 502 (1859)).

Ledoux claims that Defendants were aware of warnings from P&I Clubs "about the Indonesian Navy detaining vessels and seaman [*sic*] which the Indonesian Navy claimed were anchored illegally." (ECF No. 18 ¶ 15.) He also alleges that many of the detentions that the P&I Clubs referred to in their warnings were in "the same area [he] was directed to anchor by

Defendants and their agent." (*Id.* ¶ 16.) Finally, he alleges that these warnings were unknown to him and that but for Defendants failure to warn him, he would not have anchored M/V RELIANCE in the location instructed by Defendants and their agent. (*Id.* ¶¶ 15, 17–18.) Those allegations do not rely on the legality or lack thereof of the Indonesian Navy's detention of him. As Defendants state in their brief, liability for failure to warn "arises from foreseeability, or the knowledge that particular conduct will create danger." *See Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980). Ledoux has sufficiently alleged that, given Defendants' putative knowledge of the P&I Clubs' warnings, Ledoux's detention at Defendants' instructed anchoring location was foreseeable.

## CONCLUSION

For the reasons stated above, the Motion to Dismiss (ECF No. 19) is DENIED.

A separate Order follows.

Date: January 14, 2026

_____/s/_____

Richard D. Bennett
United States Senior District Judge

22